is MOVE, et al. v. Real Estate Alliance, et al. 2017-14-63. Mr. Husick, when you're ready. May it please the Court, good morning. This more than 10-year-old case brings me back and I feel, Your Honor, that we should be on almost a first-name basis at this point. My name is Lawrence Husick and I'm counsel for Real Estate Alliance, called REAL, whose major shareholder is the inventor, Mr. Tornetta, and this morning I'd like to address- Let me ask you a little housekeeping question, okay? On page 5 of the blue brief you say, you seek only to enforce the claims of the 989 patent against the primary defendants and have abandoned any claims regarding infringement of 576 by MOVE. If we find the 989 patent ineligible, do we need to address the divided direct infringement claims? Not with respect to the 989 patent, obviously, Your Honor, but with respect to the 576 patent, which has never been properly ruled ineligible. Yes, you would. Did the complaint raise a claim of divided direct infringement of the 576 patent by Where's that in the record, please? I don't have the exact record. The site is in the Second Amendment complaint file. You'll give that to me on reply, please. Thank you. At this point, I'd like to address the question of 101 eligibility, then waiver, then the joint direct infringement. The District Court has mischaracterized and continually mischaracterized the 989 and 576 patents. Those patents are, in fact, of the same type as this Court dealt with in trading technologies because they solve problems in graphical user interfaces by claiming a structured user interface method with prescribed functionality. The patent itself in its technical field in the 989 patent specifically says that it is for the location of real estate properties through the use of an interactive graphical locator interface. As this Court found in Reel 1, the claims require that the properties and the maps be displayed on a computer screen and zoomed to show a higher level of detail, things that cannot possibly be accomplished on paper. And just because another mapping case has been heard in a district court in Virginia that seems facially similar, although with markedly different claims, the Court jumped to the conclusion that anything dealing with a zoomable map must, therefore, fall into the same bucket as being ineligible. We submit that that is error. The 576 patent has been declared ineligible on what we can only call a I-know-it-when-I-see-it basis. The record is completely devoid of any reference, of any argument, of any submission, and of any reasoning by the Court with respect to 576, which said in its judgment that it was not declaring the 576 patent to be ineligible. With respect to waiver, this Court has recently in In Re Micron Technology on November 15th motion has said that one must focus on an available argument at the time the argument is made to the district court. In this case, at the time the various arguments were made to the district court, Real was dealing with at least four different standards for divided direct infringement under 271A. As the standards pronounced by the district court found that Real chose not to address the divided direct infringement issue in its non-infringement opposition, it moves motion for a summary judgment. During a time when what was required was actual agency, that is, the direction and control of a party performing some of the steps by a mastermind under BMC, during that time Real had no evidence of an actual agency existing. So you agree with the Court that you did not do that? At that time we could not have advanced that argument. The district court could not have found on the evidence of record, and that's very scant because remember there's never been a trial here, but the district court could not have found and overridden the standard pronounced by this circuit that there was divided infringement. Based on BMC, not based on MuniAuction that preceded BMC. What about MuniAuction which had broader language that talked about direction or control being something broader than an agency relationship? Again, the district court had found that the mere use of the website which had terms and conditions was not sufficient to find that the user's actions were chargeable to move, and the district court rejected our argument and our experts testimony that moves computer systems performed all of the steps of the claim anyway. A direct infringement, not a divided direct infringement. Now the district court had uncontroverted expert testimony that the move system did it and chose to discount that testimony. It chose to exercise its discretion in disregarding uncontroverted testimony in the context of summary judgment. We think that is error as well. Under the controlling law of the time, we could not have in good faith made an argument to the district court because we lacked a document which established that master-servant relationship under BMC, and therefore we did not make it. When the standard changed, we immediately made that argument to this court and to the district court, and in the last appeal, Reel 3, the standard changed between the time of the affirmance by the panel and the subsequent decision in Akamai. And so the case was sent back, but the court continued to ignore the users were doing something that allowed the user's actions to be charged directly to move. In other words, what we have here is a joint divided direct infringement, but under the swirling standards, which Judge Stahl certainly knows very well, we were forced to make the arguments that were available to us at the time under controlling precedent of this circuit and of the Supreme Court and could do no more. The arguments on divided direct infringement during the time when it required an actual agency or a master-servant or a mastermind and control, we could not make those arguments to the district court. It would have controverted the law which applied at the time. In Travel Century versus TROC, the December 19th decision, this court said that one must look to the activity, the benefit, the manner, and the timing. And under the facts that are of record, and remember the record is thin because there has yet not been a trial, but under the facts that are of record, we know that the activity is searching a database by map for available properties. We know that the benefit conferred on the person doing the searching is to find all of the properties that meet the criteria that are specified, most particularly the geographic criteria specified on the map. The 989 patent was, you say, among the first to teach a dynamic zoom. Absolutely, yes. Where does the patent use the term dynamic zoom? The patent uses the term zoom to reveal, to display a higher level of detail. That is how it was expressed in the map may be selected either by the system or by a user as this court said in Real One. It may then be expanded and zoomed and additional detail revealed on the map from the underlying data. What affirmative evidence demonstrates that 989 was among the first? The affirmative evidence is the patent office looking for any kind of prior art and finding none, as well as the testimony of Dr. Shasha, our expert, who says that that kind of zoom was not in practice in the early 1980s when this invention was made and the mid-1980s when it was reduced to practice and put into the market. Now, going to that idea, the idea of a double zoom seems to be in your patent, but where does your patent specification talk about as a technical matter how to implement it? In other words, I'm looking at the claims, I'm looking at the specification, and it seems to be describing what a user will see on a display screen and not necessarily talking about the technical implementation and how you make that happen. So where would I find the technical implementation in the specification, something that's more than just an idea? If one reviews the file history, one sees that there is over 300 pages of source code appendix in both the 576 and 989 cases, and that source code appendix written in C and implemented on an early IBM PC, that is one that had two floppy drives and only 256K of memory. Where are you in the record? The file history is part of the record of appeal of real one, and not included in the appendix of this appeal. So the technical explanation isn't part of the joint appendix that we're seeing. Is there a technical implementation details in the specification itself, the written description, not the appendix which has the code? The written description refers to the construction of what is called a world coordinate system, and then a use of that world coordinate system to affect the zoom so that a higher level of detail may be shown on the screen. It is described in the patent text itself in the disclosure, but is fully enabled and described in the source code appendix that was commonly included with patents in the mid-80s when these were filed. And that's hundreds of pages of code, but that code can just as easily today be typed into a computer or scanned into a computer and will operate. And so it was described, it was disclosed, it was enabled, and that zooming to a higher level of detail was a critical part of being able to locate properties because when you have a dense database, having everything there at once means that the screen becomes so cluttered that the user interface becomes unusable. My question, just so you know where my question is coming from, it's not coming from is your invention enabled. It's coming from the idea that, you know, we're supposed to look under step one of Alice and see whether the claims are directed to an abstract idea. And so one of the things I do is look to the specification to try to see if the specification has support for the idea that this is, the claims aren't just directed to, oh, this is what I would like to see done on a computer, and instead there's actual technical computer implementation. I understand, Your Honor, and what we have in the specification and its code appendix shows, and remember we're dealing with the 1980s, there is no Google Maps. There are, in fact, no electronic maps of the relevant areas that are available. This inventor had to draw his own and code them into a computer data structure. There are no databases that have the geographic coordinates tagged to them in the real estate industry because realtors were jealous they would not allow the actual property addresses there for fear that competing agents might steal their listings. And so this inventor gathered the property exact locations and coded them. All of this is described in the code appendix. This is a case in which the patentee describes an improvement in computer technology, a user interface that is not so cluttered that one cannot discern the information that is of true value. I have another question on the Akamai issue. If I remember correctly, there's something in the record where the plaintiff or the opposing party wanted to go ahead and stay the case because of Akamai to see how that was resolved, and the response was Akamai is not going to impact our affirmative infringement case. I mean, didn't you have to take affirmative steps maybe to preserve the Akamai argument knowing that the law was in a state of flux, particularly when it was pointed out by opposing counsel? At that point, Your Honor, we had been into the case for more than five years. There was an attempt to delay the case further, and we, as I said, were convinced that at trial we could show that every step of the claims had been performed by the computer that move itself ramp, and so the question of what the users did versus what the computer did, we believe that we could advance a direct infringement case, not a divided infringement case, but this court has said that once the law has changed, the argument becomes available. One should consider the argument at the time the argument can be made. But doesn't it sound as if what you're saying is you thought you had a strong direct infringement case, but then when that didn't work out, you wanted to have your joint infringement case, which you had given up in order to have the litigation proceed more efficiently? No, absolutely not, Your Honor. We never gave up that argument. We never disclaimed that argument. What we did was merely characterize that we would advance the case on the direct infringement, but we never gave up the argument of divided infringement knowing that the law was in flux, but that at that time we could not make the argument to the district court. There are no further questions. We will save your time, Mr. Husek. Ms. McGrath, we move to the appellee. May it please the court. I will be addressing today on behalf of the primary defendant appellees, three of them, MOVE, NAR, and NHB. I'd like to reserve five minutes of the allotted 20 minutes of appellee's time for counsel for the secondary defendants who will be addressing the issues unique to those defendants. I want to start with the 101 issue because we believe the district court correctly held that the claims are directed to an abstract idea. There's a whole spectrum of ways, Your Honors, that these claims in this case can be characterized as evidenced by the various ways they've been characterized to date. I really don't think it's important to get or necessarily to get too hung up on the specific words that are used. What we should do instead is follow this court's guidance in Electric Power Group versus Alstom that in step one we are to look at the focus of the claims, the character as a whole, and then lead the more for step two. When we do that we see what we're really talking about here is a computerized method for locating available real estate properties in a selected area and then displaying those properties on the map. That's what the purpose of every one of the steps is and that's what they are directed to. When we look at the claims in this manner what we see is that at their core the claims are directed to collecting information, analyzing and manipulating the Did you at any point argue that they were directed to a business method? I'm just curious. Yeah, I mean that's what it is. It's a fundamental business concept which we argued for is this concept of looking for real estate properties has been added, I mean, since the beginning of time. Taking the classifieds, turning to the real estate section, grabbing a map of the county in a pencil and circling them. That's exactly right and once MLS computers came along back in as early as the 80s, the process was computerized and these claims are directed to that same fundamental business concept. We talked a lot about, at least Council for Real talked a lot about this database and how it uses geographic coordinates and hand-selected this. None of that's in the claims. The claims recite the creation of a database, just a generic database, albeit one directed to real estate content, but that's just the collection of data. Again, this court has consistently held to be an abstract idea. Do you think the specification provides details on how to create that database? The kind of implementation details that one ordinary skill in the art would need to create it? Interesting that you ask that because this is the fourth appeal in this case. In the first appeal in this case, what we call Real One, the database limitation was construed by the district court and as originally construed, the district court gave it a lot of context and different specifics as to what it needed to look like. This court rejected that and said there's no limitation whatsoever on the type of database, number one. Number two, this is a child patent of a parent patent, the 576 patent, so there's a lot of in the specification that was actually in the claims of the 576 patent as construed by the district court that the district court also tried to put into the claims of the 989 patent, but this court rejected and said, yeah, maybe in the specification, but it's not in the claim language used. So the claim language actually uses only a generic computer with no indication as to how that computer operates and a generic database that this court specifically held is not limited to any type of database. In addition, the focus of this claims, which is where we must look at, it's not on the, quote, means or method, unquote, for implementing the idea, which is the reason the court in McRow versus Banday-Nameco upheld the claims as being valid. Instead, it's on the, quote, result or effect that is itself this abstract idea and therefore under McRow not patentable. And so that's the abstract concept prong. Isn't zooming in a physical step? Is it a physical step? Perhaps, but it is not one that either improves the functioning of the computer, which it must do under NFISH to be a patentable subject matter. But it also, it's merely, there's nothing in the claims that indicates, and Judge Tullo, you pointed this out, that indicates how the zooming is to be performed. It simply states that there is zooming. The result of the zooming, you get a higher level of detail. No technical manner indicating how it is to be done. And that is a clear distinction that this court has held in the past as being the reason why it's not an inventive concept. If you just, in fact, it was a district court case, but in X1 versus Uber Technologies, they specifically addressed this idea of a zoomable map and whether that provides the inventive concept. And the court held- Does a magnifying glass zoom in? Actually, it doesn't under, I wish I could agree with you. It doesn't under the way the claims have been construed in this case because magnifying glass merely enlarges what is already there. And this court- Okay, if I move my head closer to the screen. Again, you're seeing what's already there. And I wish I could agree with you, because I think I know where you're going with this. But this- The judge is just asking questions, not stating a point of view. I understand that. Thank you for the clarification. This court on appeal in Real One held that it actually has to do more than simply make bigger what is already there. It has to actually increase more details. But I think a good analogy would be, you have an atlas and you're looking at- And it's got a sub-map, I remember that. That's exactly right. So this is a pre-computerized business function that has been performed that we just are merely taking it and saying, let's put it on a computer now. And it doesn't give us any instructions on how to do that. It doesn't, in fact, again, if we look at what the district court did before the first appeal in this case, it actually construed both the selecting steps and the zooming steps to require specific tools for implementation. It required the selection and the zooming to be done, performed through what they called a boundary superimposed on the map. And then these first and second area selection cursors, which is exactly how the 576 patent was construed. On appeal, this court said, no, there is no requirement. In fact, the exact quote is, there is no requirement for, quote, any particular tool, such as a selection cursor or rubber band. And the court just held selecting means selecting, not in any way. Alveo seems to be arguing that their claims are directed to something that's not conventional or a technical problem that would have resulted by having this ability to do the double zoom, right? What is your response to that? Either under step one or step two. Sure. First, to put a finer point on that, it is actually a single zoom. It's not a double zoom. You zoom in one time. And there was no problem with computers. No one ever said a computer doesn't have this ability to zoom. Perhaps, and I'm not conceding, but perhaps they were the first to actually implement that on a computer. That's very iffy. But the point being that what you're doing is taking existing computer capabilities and using it to implement, or as a tool to implement this improvement. In fact, in Electric Power Grid versus Alstom, the court sort of dressed this distinction. And it was talking about EnFISH. And it said, because the claims focus not on asserted advances and uses to which existing computer capabilities could be put. That's what this is. It's an existing capability that computers could do. In other words, what they didn't do is create a new way for this computer to zoom, a more efficient way for the computer to zoom, a better way. What they did is just say, zoom. Zoom and show more detail. Switching to the other issue, why shouldn't we find that the trial on a joint infringement waiver issue? The law changed. The law changed many times during the course of this case. But interestingly, it did not change at any of the relevant points. And this is where timing becomes very important. Moove filed a motion for summary judgment in October of 2011 and put the issue of divided infringement squarely before the court. Real came back and said, no, no, no, there's no divided infringement issue. It's just Moove performed all the steps. At the time, it was the Muni Auction Standard, direction and control. That's Muni Auction Standards, what the district court called it. That's in October of 2011. Flash forward to the Real 2 appeal. That's in March of 2012, briefed between May and July of 2012. Again, Muni Auction Standard. Of course, of course, if you win on 101. It doesn't matter. Doesn't matter. Correct. So we've got the appeal, the Muni Auction Standard. Again, Moove affirmatively put forward issue of divided infringement. Real says this is just direct infringement. Moove performs everything. Now we flash forward to the third appeal in this case, the Real 3 appeal. That was in July of 2014. Guess what? It was still the Muni Auction Standard. It had changed in between then, but at that point, it was the Muni Auction Standard. And guess what Real did? Real argued that the standard for direction and control should be changed, and that under the change standard, different standards were liable. In other words, at the time of summary judgment and in Real 2, the standard for divided infringement, when they didn't argue anything about divided infringement, the standard was the same as it was in Real 2, I'm sorry, Real 3, when they did argue for divided infringement. So you said that in October 2011, the district court referred to the Muni Auction Standard. And what I heard today earlier by your adversary was a reference to the BMC standard. Was that discussed at the time? In terms of there being a distinction, no. I believe, I'm very certain that at the time of October 2011, what Move argued was that under Muni Auction, we did not direct or control the actions of the end users. And silence was the response from Real. And when they argued that we were just presenting the facts as the law was, well, the law was the same in summary judgment. The law was the same in Real 2. The law was the same in Real 3. But they changed their arguments completely at that point. It wasn't a change of law, in other words. So the question becomes, why? Why did they argue for a change in the Muni Auction Standard in Real 3 and not earlier? Because of what this court did in Real 2. If your honors remember, in Real 2, this court held Move did not perform all of the steps and Move did not direct or control the end user under the Muni Auction Standard. So those were decided issues. That really should have ended the case, but it didn't. So the only thing left for Real to argue was that the standard needs to be changed and Move held liable under the standard. So then that leaves the question, why didn't they argue that point earlier in summary judgment or on Real 2? And that's where the statements come in. I believe they were alluded to earlier. They told us why. Because they believed that this court's construction in Real 1 of the selecting steps rendered the issue of divided infringement Moot. Why they believe that, I'm not quite sure. But their own statements make that clear. They said the court's construction of the selecting steps, quote, wholly undermined Move's request and that through its construction of the selecting steps, quote, the Federal Circuit wholly rejected the specter of a divided infringement problem in this case. That's in the appendix on page 515. They believed there was no issue, notwithstanding that we continued to tell them there was an issue. So they decided not to argue. And that is what distinguishes this case from those cases where parties were allowed to argue in the light of a change in law. These statements were made when Akamai was before this court on bank and we knew the law could change and could change in their favor. They made the intentional decision not argue it. And when counsel for real argues that those were statements of preservation, my question becomes preserving for what? Usually you preserve to make the argument. But when we moved for summary judgment and said we don't infringe through divided infringement, they didn't make the argument. And the combination of those two things leads to a waiver. And unless your honors have any more questions, I will reserve the remainder of my time for counsel for the secondary defendants. All right. Thank you. We'll hear from Mr. Popper. And we can give him six minutes. Thank you, your honor. Good morning, your honors. I'm here representing all of the secondary defendants. We join in everything the primary defendants have argued. We have, I guess, one or two issues that are specific to us that is rather simple, however. After the district court expressed a specific belief that he thought that perhaps both patents were invalid under 101, he then specifically instructed the parties, including the secondary defendants, to tell him, are there any issues left? Are there any issues left? These two orders, the 101 as to the second patent and the waiver and divided infringement, think maybe the other patent's gone. Are there any issues left? The parties, including Real, submitted a joint status report. And in that, they specifically said, and Real specifically said, that in order to pursue our fourth appeal, we join in this report and we request an entry of judgment of non-infringement and invalidity. No issues. All issues are effectively resolved. The district court, relying on a statement from all parties, said, okay, I'm going to enter a judgment. Did. That's pretty much the end of the story as to the secondary defendants. Real, by responding to the district court's specific instructions to tell them what issues remained and saying there were none, put the secondary defendants effectively in the same posture as the primary defendants, such that if the primary defendants win affirmance of these issues that they've been appealing, we're going to win as well. There is no further issue that has to be resolved as to us. I would like to ask you a question or two. My understanding in looking at the record is that at this point, the two cases have been consolidated. Is that correct? I think they were consolidated early on in the case. And then there was a case management order that put the large majority of us off to the side while the three primary defendants tried most of the issues. So that's phase one versus phase two, but it's all the same case. Well, there are, yes, there are two cases under the same caption. Yes. Consolidate. The two cases were consolidated. So this order from the court was entered in the case in which the secondary defendants were in the case? Yes, Your Honor. That's absolutely true. Yes. Was it error for the district court to invalidate 576 rather than simply finding it not infringed? Your Honor, I don't think so. I think that because the district court specifically asked Real whether there were any issues and specifically mentioned that patent, and Real came back and said, nah, I think we're done here. If the other issues are ruled against us, that Real effectively conceded the validity of that patent. Now, that's a little unusual, and frankly, at a minimum, Real conceded that it was not going to be coming after the secondary defendants. So I think they conceded validity, but one way or the other, they conceded they weren't going to come after us. Are you aware of any cases in which that has been done where a party has conceded validity of their patent and judgment was entered on validity against them? No, I'm not, Your Honor. I will say I haven't specifically looked at that point, so I don't know one way or the other. What you're really saying is we win so we don't care. Yes. I do want to just briefly touch on some of the arguments made by Real in its reply brief. He spent a lot of time discussing the possibility that the judgment should have been a Rule 54B judgment, and I think that the simple answer there is that before the district court, they never asked for a 54B judgment. After the judgment was entered, they never asked to have it amended or corrected in any fashion, and in their opening brief to this court, they never mentioned Rule 54B either. There's plenty of case authority that says you have to ask for certification. Yes, Your Honor. One other point I would make on that, Real implies in its brief that it was appropriate to interpret the district court's December 1, 2016 order as instructing to talk about issues only related to Phase I. That really makes no sense if you look at that order, because the district court had specifically mentioned the 576 patent and had specifically asked the secondary defendants to be involved. The secondary defendants were only involved in the Phase II action. Is that correct? I think your position is that because they were going to be in Phase II, we've been monitoring all along, but we have not actively participated in Phase I. I'm just trying to understand the import of your argument. I think what you're saying is that by referring to the secondary defendants, that necessarily means that it was referring to the Phase II litigation. Yes, Your Honor. Yes. And then also by referring to the patent. Wait just a minute. Sorry, I apologize. By referring to the 576 patent, it also was just referring to the Phase II because the 576 patent was no longer at issue in Phase I. Yes, Your Honor. Exactly. Okay. Unless you have other questions, I'm going to sit down. Thank you, Mr. Parker. Mr. Husick has almost five minutes. Your Honor, we've addressed all these points on our brief, and I surrender the rest of my time. Thank you. Mr. Husick will take the case on revisement.